IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| SONIA L. THOMAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: **CV-03-PT-3241-E** |
| | ) | |
| ALABAMA HOME CONSTRUCTION, | ) | |
| INC. and AHCI MANAGEMENT, | ) | |
| COMPANY, INC., | ) | |
| | ) | |
| Defendants. | ) | |

-------------------------------------------------

| | | |
|---|---|---|
| | ) | |
| BETH GERHARDT, etc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: **CV-03-PT-3247-M** |
| | ) | |
| ALABAMA HOME CONSTRUCTION, | ) | |
| INC., a corporation; LAVELLE SMITH, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This cause comes on to be heard upon defendants, Alabama Home Construction, Inc.'s,

AHCI Management Company, Inc.'s, and Lavelle Smith's Motion for Summary Judgment, filed

on August 2, 2004.

## FACTS[1] AND PROCEDURAL HISTORY

### I.    Introduction.

--------------------------------

[1] The court notes where "facts" appear disputed.

1

**A.     The Parties.**

Defendant Alabama Home Construction, Inc ("AHC") was incorporated on May 13,

1991.  AHC constructs residential housing.  Philip Gilbert ("Gilbert") is the company's

president.

Defendant AHCI Management Company, Inc. ("AHCI Management") was incorporated

on February 3, 2000.  AHCI Management manages the sales of homes constructed by AHC.

Suzanne Gilbert, the wife of Philip Gilbert, is AHCI Management's president.

Both AHC and AHCI Management are operated out of the same corporate office in

Albertville, Alabama and both are owned by the Gilberts.  The Gilberts also own a mortgage

company, Alabama Mortgage, Inc. ("Alabama Mortgage").  Philip Gilbert is the president of

Alabama Mortgage.  AHC and AHCI Management have several sales offices in different areas,

including one in Pell City, Alabama.  William Daugherty ("Daugherty") testified that he was

Division Director for the Pell City and Oneonta sales offices in 2000.  Daugherty's wife, Janie

Daugherty, assisted him in his position.[2]

Plaintiff Beth F. Gerhardt ("Gerhardt") is a white female who began working for

defendant AHC at its Pell City office in February 1998.  Gerhardt worked as an inside/outside

sales representative and office manager for AHC.  On February 3, 2000, Gerhardt signed a

subcontractor agreement with AHC.  This agreement stated in part:

> Although the Contractor [AHC] has control over the quality of all work, the
> Subcontractor [Gerhardt] is an independent Contractor in all respects; the
> Subcontractor is responsible for [her] workman's compensation, withholding
> taxes, social security taxes, unemployment taxes and any other applicable taxes,

---

[2] The record is not clear as to whether, at the times relevant to this action, William and
Janie Daugherty were employees of the corporate defendants or independent contractors.

2

benefits and insurance.  The Subcontractor is responsible for coordinating [her] activities.[3]

In approximately October 1999, AHC hired defendant Lavelle Smith ("Smith"), an African American male, to work in the Pell City office, also as an inside/outside sales representative.  On January 15, 2000, Smith signed a subcontractor agreement with AHC with the same provisions as those in the agreement signed by Gerhardt.[4]

In June 2000, Sonia L. Thomas, an African American female, was interviewed by William Daugherty and hired as a temporary secretary for the Pell City office.  Thomas was later placed in a permanent position.[5]  Thomas was required to work approximately six days a week.  Thomas worked anywhere from 8:00 a.m. to 4:00 p.m. and/or 9:00 a.m. to 5:00 p.m. on Monday through Friday and from 8:00 a.m. to 1:00 p.m. and/or 9:00 a.m. to 1:00 p.m on Saturdays.  Philip Gilbert testified that he had to approve the hiring of Thomas.

**B.      The Corporate Defendants' Control Over the Pell City Office and Sales People.**

The corporate defendants home office in Albertville set the days and hours of operation for the other sales offices.  The Pell City office's hours of operation were Monday through Friday from 9:00 a.m. to 5:00 p.m. and Saturday from 9:00 a.m. to 3:00 p.m.  Additionally, the home office sent a monthly calendar to each sales office that listed who was to work in the office

---

[3] There is a dispute of fact concerning whether Gerhard was an employee of AHC or an independent contractor at the times relevant to this action.

[4] There is a dispute of fact concerning whether Smith was an employee of AHC and/or AHCI Management or an independent contractor at the times relevant to this action.

[5] Defendant AHCI Management admits that it employed Thomas withing the meaning of Title VII on June 27, 2000.  However, defendants maintain that Thomas was not an employee of AHC and does not allege in her complaint that she was ever employed by AHC.

and who was to work outside the office on each day. The corporate defendants further informed the staff members when the sales offices would be open or closed.

Gerhardt and Smith made their schedules to ensure that at least one of them would be in the Pell City office at all times. Sales people, such as Gerhardt and Smith, were required to inform the corporate defendants which days they wanted off. Sales people were also required to request time off for vacations and sick days from the corporate defendants. AHC's dress code required office staff to wear business-type clothes to work. Additionally, the corporate defendants limited the geographic areas in which sales people could sell. This limitation was determined by Philip Gilbert and William Daugherty. Sales people were also required to bird-dog[6] one day a week.

Gerhardt testified that Philip Gilbert required sales people to send three weekly reports: a sales report, a telephone log, and a bird dog log. If a sales report and/or bird dog log was not sent, the sales person would be fined. Gilbert testified that sales people were also required to attend regular monthly sales meetings conducted by Gilbert and William Daugherty at the corporate office in Albertville. The corporate office in Albertville also handled all advertising, which had to be approved by Daugherty. Further, the corporate defendants required the sales people to handle loan packages in a certain manner.

Philip Gilbert had authority to discipline Thomas, Gerhardt and Smith. Additionally, Gilbert required that Gerhardt and Jan Logan ("Logan"), a sales person in the corporate defendants' Sylacauga, Alabama office, answer to him for any administrative issues that arose.

_____

[6] Also known as a "field day." Philip Gilbert testified that "bird-dogging" was when a sales person goes into the field and puts brochures in stores and businesses.

The corporate office in Albertville also controlled what phone lines staff members in the branch offices could use for personal calls, the amount of time spent on such calls, and whether calls were to be made to the corporate office. If any staff member contacted Philip or Suzanne Gilbert at home, it was considered grounds for automatic termination.

AHC did not have an employee handbook during the time period relevant to this action. Additionally, AHC did not have a sexual harassment policy until December 6, 2000, after Thomas and Gerhardt had been terminated. AHCI Management now has an employee handbook, but it also was created after Thomas and Gilbert were dismissed.

## II.  Gerhardt's Claims.

### A.  Facts Relevant to Gerhardt's Title VII Sexual Harassment Claim Against AHC.

#### 1.  Early in Smith's Employment with AHC.

According to Gerhardt's Interrogatory Answers, just after Smith began working for AHC, he received many phone calls from a woman who was not his wife. One day, Smith came into Gerhardt's office and began to tell her that he could not help the way he was, and that he loved women and could not resist them. Gerhardt asked about Smith's wife, and Smith responded that he takes care of her but that he needs more from a relationship than she gives him.

Additionally, Gerhardt stated that during the first couple of months that Smith worked at the Pell City office, she frequently caught him looking down the front of her blouse. Afterward, she changed her mode of dress to avoid such stares. Gerhardt complained about this to William and Janie Daugherty and to Philip and Suzanne Gilbert.

#### 2.  October 18, 1999.

On October 18, 1999 Gerhardt recorded in a handwritten note a conversation she had that day with William Daugherty. The note states that Gerhardt reported to Daugherty that Smith often stared at her, looking up and down her body. Gerhardt told Daugherty that this made her feel very uncomfortable. In response to her complaint, Daugherty told Gerhardt that Smith was a nice guy, a preacher, and probably didn't realize the manner in which he was staring at her.

### 3.    October 26, 1999.

On October 26, 1999, Gerhardt met with Philip Gilbert and William Daugherty in Asheville, Alabama at a Texaco station. Gerhardt recorded the substance of that conversation in a handwritten note. According to the note, Gerhardt complained to them about Smith's behavior, how it made her uncomfortable, and how Smith had begun to discuss his sexual activities with her. Gilbert and Daugherty told Gerhardt that she should not worry about Smith because he was going to be put in a different office, and that a new employee from Jim Walters Homes would replace him in the Pell City office. Gilbert told Gerhardt during this meeting that he could not stand "fake preachers" (referring to Smith). Gilbert also told Gerhardt that Smith had no business discussing sex with her. According to Gerhardt, Gilbert asked if she had said anything to Smith about not speaking about such things in her presence. Gerhardt replied that she had, and that she had told Smith that she didn't want to hear anything about his personal life. Finally, Gilbert told her not to worry about Smith because he would be out of her office soon.

### 4.    November 1999.

According to Gerhardt's Interrogatory Responses, in November 1999, while standing in the doorway to her office, Smith asked Gerhardt if she had ever slept with a black man. She replied "no." Smith also asked Gerhardt if she had ever dated a black man, and she replied "no."

Smith further asked Gerhardt if she would ever be with a black man and if she had ever cheated on her husband.  Smith went on to tell Gerhardt that he had slept with a lot of white women.

In her Interrogatory Responses, Gerhardt also discussed another incident occurring in November 1999.  One day when Gerhardt was having a bad day at work, Smith told her: "You need a man to pop you just right; maybe we should lock the front door and go to the back room."  Gerhardt reported that she told Smith to get away from her, and that he went back to his office.

### 5.    November 4, 1999.

Gerhardt recorded in a typewritten note a conversation she had with Philip Gilbert on November 4, 1999 concerning Smith's actions.  According to the note, Gilbert asked Gerhardt how things were going with Smith, to which Gerhardt replied that Smith was still making her feel uncomfortable by making sexual comments.  Gerhardt told Gilbert that she would never again wear the short black dress she was wearing that day because, upon seeing her walk down the hall, Smith had mumbled "mmm mmm mmm."  Gerhardt told Gilbert that Smith had spoken to her about all his girlfriends, and had mentioned that many of them were white.  Gerhardt said that she took this to mean that Smith wanted her to know he did not have a problem with race.  According to the note, Gerhardt also told Gilbert that she had discussed Smith's behavior with William and Janie Daugherty on several occasions, and that she wanted it stopped immediately.  Gilbert told Gerhardt that he would take care of the situation and to let him know if anything else happened.

### 6.    November 13, 1999.

On November 13, 1999, Gerhardt recorded in a handwritten note a phone conversation she had with Janie and William Daugherty.  In that note, Gerhardt reported that she told Janie

Daugherty that things were "getting out of hand" with Smith.  Smith had been speaking to

Gerhardt about his white girlfriends and asked Gerhardt if she ever had or would ever have an

affair while still married to her husband.  Smith spoke about his past and present sexual activities

and stated that he was not satisfied with his wife.  According to the note, Janie Daugherty told

Gerhardt that she was a "big girl" and that she needed to tell Smith to stop his actions.  Gerhardt

told Janie Daugherty that she had asked Smith to stop making such comments, and had even

asked him to leave her office at times.  Gerhardt also stated that she often walked out of the room

when Smith began making such comments outside of her office.  According to the note, Janie

Daugherty responded to this report by telling Gerhardt that she was "going to have to just get

ugly with him and tell him to stop it."  Later in the conversation William Daugherty joined his

wife and Gerhardt on the phone.  Both William and Janie Daugherty told Gerhardt that she

would have to be the one to handle Smith and convince him to stop his sexually-related

comments.

### 7.    November 16, 1999.

In a handwritten note dated November 16, 1999, Gerhardt recorded a conversation she

had with Smith.  According to the note, Smith began to speak to Gerhardt about his sexual

activities with a woman with whom he had worked at a cemetery company.  Gerhardt told Smith

never to discuss with her anything regarding sex again or she would be forced to take some kind

of action.

### 8.    2000.

In her Interrogatory Answers, Gerhardt reported on another incident with Smith in 2000.

One day Gerhardt noticed that Smith appeared to be worried.  Smith told Gerhardt about a

woman in Leeds, Alabama, whom he had been seeing and who now claimed that she was pregnant by him.  According to Smith, this lady went to the elders of the church Smith pastors and told them her story.  Smith told Gerhardt that he was worried what his wife was going to do about the situation.  Gerhardt reported this conversation to Janie and William Daugherty and to Suzanne Gilbert.

Later on, Smith entered Gerhardt's office and told her that the woman from Leeds had had him arrested, claiming that he had painted the word "bitch" on the front door of her apartment.  Gerhardt was called as a witness in that criminal case to testify that Smith had been at work on the day of the purported incident.  Gerhardt reported this incident to William Daugherty.

Also in 2000, Gerhardt assisted Smith with one of his customers, Marty Cook, a female.  While they were filling out forms, Gerhardt saw Smith looking directly down Cook's shirt.  Out of Cook's presence, Gerhardt told Smith that she never wanted to see him doing that again.  She also reported the incident to William Daugherty.

#### 9.    January or February 2000.

According to Gerhardt's Interrogatory Answers, around January or February 2000, Jan Logan called her and stated that she did not know what to do with Smith.  Logan stated that Smith continuously came to her office in Sylacauga and had begun to buy her gifts.  Logan told Gerhardt that Smith had asked her to run away to Hawaii with him, and had told her he would take care of her.  Gerhardt told Logan to document everything and to report this to her division manager.  On numerous occasions in 2000, Gerhardt reported this situation to William and Janie Daugherty and to Suzanne Gilbert.  Gerhardt also reported the situation to Logan's division

manager.[7]

### 10.    July 2000.

According to Gerhardt's Interrogatory Answers, one day in July 2000, Smith called out

from his office that he needed Gerhardt's help.  When she walked in, Smith showed her a

photograph on his computer of a naked woman with an object coming out of her vagina.  Smith

said to Gerhardt, "Look what I found."  Gerhardt left Smith's office and reported the incident to

Janie Daugherty and Suzanne Gilbert.

### 11.    August 18 and 19, 2000.

In a note dated  August 19, 2000 and signed by Gerhardt and Thomas, Gerhardt reported

an incident involving Smith.  According to the note, on August 18, 2000, Gerhardt walked into

Smith's office to find him looking up Thomas' skirt as Thomas was on the phone discussing a

business-related matter.  That day, Thomas wore a full "broomstick" skirt that reached almost to

the floor, and Smith was holding it up with his hand.  When Smith saw Gerhardt, he jumped and

bumped into Thomas, at which time Thomas realized what Smith had been doing.  Soon

thereafter, Thomas asked Gerhardt exactly what Smith had been doing with her skirt.  Later that

evening, Thomas called Gerhardt to discuss the situation, the possibility of retaliation if she

reported it, and how Smith made Thomas feel uncomfortable.

The next day, August 19, 2000, Gerhardt spoke with Janie Daugherty and described the

incident to her.  Janie Daugherty told Gerhardt that she thought the best manner of dealing with

---

[7] Defendants contest the occurrence of this incident.  Defendants point out that Gerhardt
testified in her deposition that she first learned about the alleged Jan Logan incident after she
found an lawyer, and that she first started looking for a lawyer within a month of being
terminated.

10

the situation was for Gerhardt to reprimand Smith and conceal the incident from the corporate

headquarters.  Gerhardt told Janie Daugherty that the incident could not be dropped so easily,

that her husband knew about it, and that Mr. Gerhardt did not want her working in the same

office with a "pervert."  In response, Janie Daugherty told Gerhardt that, if the issue went to

Philip Gilbert, both she and Smith "would be gone."  Gerhardt asked why she would be

dismissed, and Janie Daugherty replied: "because Phil [Gilbert] thinks that you are a trouble

maker and that a lot of the problems with the Pell City office are because of you."  Gerhardt then

told Janie Daugherty that she was tired of Smith's "wrongful doings being swept under the

carpet" and that "[she] wanted this situation taken care of Monday."[8]

### 12.    June 2000.

According to Gerhardt's Interrogatory Answers, around June 2000 at the Pell City office,

Smith told Gerhardt and Thomas that he and Jan Logan were seeing each other and were going

to run away together to Hawaii.  Gerhardt reported this incident to Janie Daugherty and Suzanne

Gilbert.

### 13.    Other Instances, Exact Dates Unknown.

According to Gerhardt's Interrogatory Answers, Smith made sexually-related comments

to her and Thomas on several occasions in the kitchen of the Pell City office.  For example,

Smith talked to Gerhardt about being with other women sexually because his wife was too

conservative to try unconventional sexual positions.  Smith also made comments concerning his

wife's unwillingness to perform oral sex on him.  Smith further told Gerhardt and Thomas about

---

[8] Gerhardt also points to these facts as evidence of her Title VII Retaliation claim against
AHC.

11

a woman that he would meet to "get a quick blow job."  Gerhardt stated that she reported these
incidents to Suzanne Gilbert.

On another occasion, Gerhardt was in the front lobby of the Pell City office working on
display samples.  Smith approached Gerhardt, who was wearing a skirt, and said, "you got some
long, pretty legs, I bet they feel good."  Gerhardt went to her office to get away from Smith.  At
other times Smith has said to Gerhardt, "You sure smell good, wonder how you taste" and
"mmm, mmm, mmm, what I could do to you."

**B.      Facts Relevant to Gerhardt's Title VII Retaliation Claim Against AHC.**

**1.      August 21, 2000.**

On August 21, 2000, Philip Gilbert held an interview with Gerhardt to discuss the
problems at the Pell City office.  During this interview, Gerhardt stated that Smith had made the
comment that he couldn't "get in trouble" with Gilbert because he is black.  In response to this,
Gilbert stated, "I can fire anybody for any reason I want to fire them."

**2.      September 11 and 12, 2000.**

Thomas was terminated around September 8, 2000.  On September 11, 2000, Gerhardt
telephoned William Daugherty to tell him that, since Thomas was fired, she did not feel
comfortable working in the same office as Smith.  She also explained that she should be moved
to a different location, and that she did not feel physically safe alone with Smith in the office.
Daugherty told her that he would speak to Philip Gilbert and let her know something.

When Gerhardt arrived at work the next morning on September 12, 2000, the lock to the
front door had been changed.  When Smith arrived, he told Gerhardt that he could not let her in.
Gerhardt called the Pell City Police Department and asked for assistance in removing her

personal belongings from the office.  When a police officer arrived, he telephoned William

Daugherty and told him that Gerhardt had to be allowed to remove her personal belongings from

the building.  Daugherty told the officer that Gerhardt could remove her things when he arrived

at the office.  When Daugherty arrived, Gerhardt found that her office door lock had also been

changed.

While Gerhardt was removing her personal belongings from her office, Daugherty told

her that she could not take any paperwork or files, nor could she touch her computer.  There was

a brief exchange as to whether Gerhardt could take some paperwork.  Gerhardt asked Daugherty

if she was terminated, and he replied, "I guess so."  She asked him why, to which he responded,

"I'm doing what Phil [Gilbert] said.  You will have to ask him."  On a later day, Gerhardt spoke

with Gilbert about why she had been terminated.  Gilbert replied, "Billy [Daugherty] made that

decision.  I left it up to him.  He said you gave him an ultimatum: it was you or Lavelle [Smith]."

### C.   Facts Relevant to Gerhardt's Assault Claim Against Smith.

In support of her assault claim against Smith, Gerhardt points to the facts relevant to her

sexual harassment claim as discussed above.  Specifically, Gerhardt points to the incident in

2000 when she was required to testify in a judicial proceeding, in which Smith was accused of

painting the word "bitch" on the front door of a woman's apartment.  Gerhardt also highlights

Smith's comments to her such as "what I could do to you," and his lifting up Thomas' skirt in

her presence.

### III.   Thomas' Claims.

### A.   Facts Relevant to Thomas' Sexual Harassment and Hostile Work
### Environment Claim.

13

### 1.     Smith's General Conduct Towards Thomas.

Thomas testified in her deposition that, during her employment with the corporate defendants, Smith made passes at her and commented to her that she was very attractive. On a regular basis, Smith told Thomas that he should have "saved her" for himself instead of introducing her to Torrence Thomas, her husband.

In her deposition, Thomas testified that she tried to ignore Smith's conduct. She asked Smith why he was making advances toward her, but he never gave an answer. As a result of his conduct, Thomas testified, she did not like being in the office alone with Smith. Thomas stated she had informed Gerhardt on several occasions that she did not like working alone with Smith. However, Thomas further testified that she did not want Gerhardt to report Smith's conduct toward her to the corporate headquarters. Thomas was afraid that such reports would cause her to lose her job. According to Thomas, when she was initially hired, she was informed that there was to be no fraternizing between her and Smith and that, if such fraternizing was discovered, she would be terminated. Thomas testified that she did not want to be a "troublemaker." At the time, she also believed she could handle Smith on her own because she had worked in similar work environments in the past.

Thomas testified that Smith also made many sexual comments to her. According to Thomas, Smith discussed his sex life in her presence and stated that his wife would not allow him to have the Playboy channel at his house. Thomas also testified that Smith stated in her presence that his wife hardly ever had sex with him. Smith also asked Thomas if she had engaged in certain sexual activities with her husband.

### 2.     Smith's Conduct Toward Other Female Staff Members.

14

According to Thomas, during her employment with the corporate defendants, she became aware of Smith sexually harassing other female employees, including Gerhardt and Logan. Smith testified that he told Logan of an extramarital affair he had that resulted in the female alleging that she was pregnant by him.  Smith also stated that he "probably" touched Logan's breast while at work, and that he kissed Logan on several occasions in his office in Pell City and in Logan's office in Sylacauga.  Logan testified that, in June 2000, Smith, without her consent, threw her against a refrigerator and tried to kiss her.  Logan stated that Smith then threw her onto the floor, pulled her skirt up, and penetrated her vagina with his fingers.  Logan testified that she started to cry and asked Smith why he was hurting her.[9]

### 3.     The August 18, 2000 Incident.

Thomas testified that on August 18, 2000, she was using the telephone in Smith's office to call the *Daily Home Newspaper* regarding an advertisement.  Thomas was using the phone in Smith's office because Gerhardt was using the other phone.  While on the phone, Smith stood directly behind her in front of a filing cabinet located to the right of his desk.  Thomas stated that during her phone conversation, Gerhardt entered the office and asked Smith: "What are you doing?"  According to Thomas, she turned around to see Smith lifting the bottom of her skirt in the air, exposing her underwear,[10] and looking under her skirt.  Still on the phone, Thomas pulled her skirt down and made an angry hand gesture to Smith.  After she hung up the phone, Thomas asked Smith, "what the hell were you doing?," to which her replied: "Nothing.  Nothing.  I'm

---

[9] Defendants deny that the June 2000 event between Smith and Logan occurred.

[10] Thomas testified that, after Smith apologized to her, he commented on her animal print underwear.

15

sorry."

According to Thomas the August 18, 2000 incident was reported to the corporate defendants' management.[11]  Thomas testified that on August 21, 2000 she was interviewed by Philip Gilbert concerning the matter.  Because she was fearful of being terminated, Thomas informed Gilbert that she did not realize that Smith's conduct constituted sexual harassment.

### 4.    The Corporate Defendants' Knowledge of Smith's Conduct.

Thomas asserts that defendants were aware of Smith sexually harassing other employees prior to the August 18, 2000 incident.[12]  Gerhardt testified that Logan complained to her that Smith was spending a lot of time at her office in Sylacauga.  Janie Daugherty testified that Gerhardt reported to her that Smith was going to Logan's office frequently and that something was "going on."  Janie Daugherty stated that she reported this information to her husband.[13]

Philip Gilbert testified that he could not recall whether any job references were checked prior to Smith being hired.  Prior to his employment with the corporate defendants, Smith worked as a Unit Manager in the sales department of Elmwood Cemetery and Mausoleum.  In August 1997, while Smith was employed by Elmwood, three female co-workers made complaints of sexual harassment against him.  On November 10, 1997, Smith transferred from Elmwood Cemetery to Forest Hill Cemetery.  In or about 1998, a female co-worker made complaints against Smith for sexual assault.  On or about June 8, 1998, Smith voluntarily

---

[11] Defendants deny that the August 18, 2000 incident was reported to management.

[12] Defendants deny this assertion.  Thomas also points to many of the same facts discussed above relating to Gerhardt's claims.

[13] Defendants deny the assertions contained in this paragraph and argue that they are irrelevant and based on hearsay.

resigned his employment with Forest Hill.[14]

**B.      Facts Relevant to Thomas' Retaliation Claim.**

Thomas was terminated around September 8, 2000, which was approximately eighteen days after Philip Gilbert interviewed her and Gerhardt concerning Smith's conduct.  Gilbert testified in deposition that Thomas was terminated because she was not needed anymore because there were two sales people in the Pell City office.  As there were two sales people in the office, Gilbert testified, there was no need for a secretary.  However, Gerhardt, one of the sales people in the Pell City office, was terminated around the same time as Thomas.

**IV.     Procedural History.**

On November 8, 2000, Gerhard filed a Charge of Discrimination against the corporate defendants with the Equal Employment Opportunity Commission ("EEOC").  On June 26, 2003, the EEOC issued a Determination that the evidence obtained established reasonable cause to believe that Gerhardt was subjected to sexual harassment and a hostile work environment because of her sex, female.  The Determination also stated that there was sufficient evidence to establish reasonable cause to believe that Gerhardt was subject to retaliation when she was terminated.  Finally, the Determination stated that AHC was an employer within the meaning of Title VII and that all requirements for coverage had been met.  This was a final determination.

Gerhardt filed her action on December 5, 2003.  Through her Complaint, Gerhardt sought to represent a class of litigants consisting of all current and former female employees of AHC who have worked with AHC in the last ten (10) years.  Her Complaint contains the following

---

[14] Defendants deny the assertions in this paragraph concerning Smith's prior employment and argue that the documentation offered to prove these facts has not been authenticated and is not relevant.

counts: (1) Count One – Title VII Sexual Harassment by Alabama Home Construction, Inc.;[15] (2)

Count Two – Title VII Retaliation by Alabama Home Construction, Inc.;[16] and (3) Count Three –

Assault by Lavelle Smith.[17]

Similarly, on November 8, 2000, Thomas filed a Charge of Discrimination with the

EEOC.  The EEOC issued a determination on June 26, 2003, finding reasonable cause to believe

that Thomas and a class of females were subjected to sexual harassment and a hostile work

environment based on sex.  Additionally, the EEOC found that Thomas was subjected to

---

[15] Gerhardt's Count One alleges that, almost immediately after Smith was hired by AHC, he started sexually harassing her.  Despite being asked to stop, Smith allegedly told Gerhardt of his sexual experiences and made comments about the two of them engaging in sexual activities. Gerhardt alleges that she complained to the management of AHC on several occasions, but no remedial action was taken.  Gerhardt further asserts that AHC did not have in place policies and/or procedures regarding sexual harassment or discrimination.

[16] Gerhardt's Count Two states:

> Gerhardt was terminated from her employment with AHC on September 12, 2000.
>
> In taking the above-described actions, defendant AHC intentionally and wrongfully retaliated against plaintiff for her prior complaints of discrimination in violation of Title VII.
>
> As a result of this retaliation, plaintiff was caused to be injured and damaged; to have her career significantly and adversely impacted; to forego compensation and benefits; and to endure mental anguish, emotional distress, humiliation, and shame.

[17] Gerhardt's Count Three alleges that Smith leered at her in a sexual manner and spoke to her about his sexual experiences with other women.  Gerhardt also asserts that, after being asked to stop, Smith continuously repeated offensive sexual comments to her throughout her employment with AHC.  Gerhardt further alleges that these comments made her fear for her safety.

Through her Complaint, Gerhardt requests compensatory damages, punitive damages, injunctive relief, other equitable relief, pre- and post- judgment interest, attorneys' fees, and costs.

retaliation when she was terminated in violation of Title VII.  On September 3, 2003, after

conciliation efforts failed, the EEOC issued a Right to Sue letter to Thomas.  Thomas filed her

action on December 5, 2003.  Her Complaint contains two counts: (1) Count One – Sexual

Harassment and Hostile Work Environment;[18] and (2) Count Two – Retaliation.[19]

On January 7, 2004, the two cases were consolidated without objection upon defendants'

---

[18] Thomas' Count One states:

> In taking the above-described actions, defendants intentionally discriminated
> against plaintiff on the basis of her gender, in violation of Title VII of the Civil
> Rights Act of 1964, as amended.  Specifically defendants condoned and tolerated
> sexual harassment at its facilities.  Defendants' actions created, nurtured,
> tolerated, condoned, or otherwise permitted a sexually hostile environment in
> violation of Title VII of the Civil Rights Act of 1964, as amended.

> The actions of defendants were taken with malice or reckless indifference to the
> federally protected rights of plaintiff.

> As a proximate consequence of the violation of Title VII by defendants, plaintiff
> has suffered and will continue to suffer past and future pecuniary losses,
> emotional pain, inconvenience, mental anguish, loss of enjoyment of life, and
> non-pecuniary damages.

[19] Thomas' Count Two states:

> In taking the above-described actions, defendants intentionally and willfully
> discriminated against plaintiff in retaliation for her prior complaints of
> discriminatory behavior.  Ms. Thomas' employment was terminated in retaliation
> for opposing sexual harassment.

> As a proximate consequence of the aforesaid violations of Title VII by
> defendants, plaintiff was caused to be injured and damaged; to have her career
> significantly and adversely impacted; to forego compensation and benefits; and to
> endure mental anguish, emotional distress, humiliation, shame, and
> embarrassment.

In her Complaint, Thomas asks for reinstatement, or, in the alternative, front pay, back
pay, injunctive relief, pre-judgment interest, attorney's fees, costs, punitive and liquidated
damages, and compensatory damages.

Motion.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings,

discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue

as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A dispute is

genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for

summary judgment bears the initial burden of explaining the basis of his motion. *Celotex*, 477

U.S. at 323. "It is never enough [for the movant] simply to state that the non-moving party could

not meet their burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000)

(quotation omitted). The non-moving party then bears the burden of pointing to specific facts

demonstrating that there is a genuine issue of fact for trial. *Celotex*, 477 U.S. at 324. The non-

moving party "must either point to evidence in the record or present additional evidence

'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary

deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted).

Summary judgment is required where the non-moving party merely repeats its conclusory

allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay,* 265

F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for

discovery. *Comer*, 265 F.3d at 1192. Moreover, "[w]hen deciding whether summary judgment

is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a

light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291,

1293 (11th Cir. 1999). Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

## ARGUMENTS

### I.    Plaintiff Gerhardt's Opposition to Defendants' Motion for Summary Judgment.

Given the above discussed facts, Gerhardt contends that she has met the prima facie elements of her Title VII and assault claims. According to Gerhardt, she was a member of a protected class, she was subject to unwelcome conduct throughout her employment with AHC, and the harassment was based on her sex, female. Under the totality of the circumstances, Gerhardt maintains, the above instances of sexual harassment were so severe that they altered the terms and conditions of her employment and created an abusive working environment. Gerhardt asserts that a reasonable jury would more than likely find the instances of sexual harassment to have been abusive. She argues that these instances of harassment were frequent and severe, and that they unreasonably interfered with her job performance.

Further, Gerhardt asserts, the evidence supports her claim of retaliation when she was terminated after complaining about Smith's sexually harassing behavior. Gerhardt notes that the EEOC issued a "for cause" finding as to both her Title VII hostile work environment and retaliation claims. Finally, Gerhardt concludes that a reasonable jury could find that Smith placed her in apprehension for her physical safety based on his continuous harassment and other conduct.

### II.    Defendants' Response to Plaintiff Gerhardt's Opposition.

#### A.    Jurisdiction.

According to defendants, AHCI Management was incorporated on February 3, 2000. Defendants assert that prior to February 3, 2000, Gerhardt was employed by AHC, but that after that date she was only a subcontractor. Defendants point out that on February 3, 2000 (the day of AHCI Management's incorporation), Gerhardt signed a "Contractor and Subcontractor Agreement," with AHC.[20]

**B.     Hostile Environment.**

        **1.     The 180 Day Period.**

According to defendants, the EEOC Charge filed by Gerhardt on November 8, 2000, was filed more than 180 days after her employment with AHC ended. Defendants maintain that the 180 day period preceding Gerhardt's EEOC filing commenced on May 14, 2000.[21]

        **2.     The Timely Identified Complaints Were Not Severe or Pervasive.**

Defendants argue that Gerhardt's timely identified complaints were not severe or pervasive. Defendants point out that Gerhardt testified in her deposition that Smith "never laid a finger on [her]." According to defendants, Gerhardt points to only three events that occurred during the statutory period: (1) the August 18 and 19, 2000 incident, during which Smith allegedly lifted Thomas' skirt in Gerhardt's presence; (2) the June 2000 incident, during which Smith allegedly told Gerhardt and Thomas that he and Jan Logan were seeing each other; and (3) the July 2000 incident, during which Smith allegedly called Gerhardt into his office to show her

_____

[20] The most relevant provisions of this agreement are quoted in the Facts section of this opinion.

[21] Defendants appear to be basing this argument on the assumption that Gerhardt's employment with AHC ended on February 3, 2000, when she signed the subcontractor agreement.

an image of naked woman on his computer.  Defendants assert that these aggregated events do not constitute severe or pervasive misconduct.

### 3.    The Prior Complaints "Eased Up."

Defendants note that Gerhardt's EEOC charge recounts specific complaints Gerhardt allegedly made to the corporate defendants on October 18, 1999, October 26, 1999 and November 13, 1999.  Defendants point out that Gerhardt testified in her deposition that Smith's actions became better after she complained to William Daugherty in the Fall of 1999.  Defendants highlight Gerhardt's testimony that: "Most of the blatant just come right out and make you feel threatened and uncomfortable, most of that was in the beginning.  It eased up.  There was still you know, uh, uh, uhs, gestures, and things that kept me uncomfortable."

### 4.    Smith's Sex Comments Were Not Unwelcome.

Defendants argue that Smith's sex comments to Gerhardt were not unwelcome.  Defendants point out that when asked if both Smith and Gerhardt discussed sex at work, Thomas testified as follows:

> A:    It might have went on for a few months.  But like I said, it wasn't like anybody came in the office and just said let's sit down and talk about sex.  It was—I don't know what—it would be like something that would bring something up.  It was light hearted to me.  I don't know.  I can't really recall because I did not know I was going to have to be remembering all of that stuff at that time.
>
> Q:    But they were both making light-hearted comments about sex periodically?
>
> A:    Right.
>
> Q:    Did you ever make light-hearted comments about sex?
>
> A:    I probably did.

### 5.    No Evidence That Smith's Conduct Was "Because of Sex."

Defendants assert that Gerhardt has not offered any evidence that Smith's conduct was

23

"because of sex."

      **6.**    **Smith's Conduct Did Not Unreasonably Interfere with Gerhardt's**

              **Job.**

Defendants argue that Smith's alleged misconduct did not impair Gerhardt's ability to

perform under her subcontractor agreement.  In support of this proposition, defendants highlight

Gerhardt's following deposition testimony:

> Q:    Did you do a good job as a subcontractor for Alabama Home during the
>        last six months of your employment?
> A:    I am not sure exactly when the last award that I won, but I had won a trip
>        in the last six months.  I had sold more than anybody else and had won a
>        trip.  I had received, you know, several different plaques, certificates,
>        whatever you want to call them.  I was top sales office and top sales
>        person.
> Q:    Well, were your sales dropping off toward the end of your employment?
> A:    Not that I remember.

      **7.**    **Damages.**

Finally, defendants assert that Gerhardt has offered no evidence of damages.

**C.**    **Retaliation.**

Defendants maintain that Gerhard did not participate in protected conduct or oppose

conduct made unlawful by Title VII; she simply reported that she saw Smith lift Thomas' skirt.

According to defendants, that single event was not severe or pervasive and did not unreasonably

interfere with the performance of the job.  Furthermore, defendants assert that Philip Gilbert

legitimately terminated Gerhardt's subcontractor agreement after she gave him the ultimatum to

transfer her or Smith.

**D.**    **Assault.**

Regarding her assault claim, defendants assert that Gerhardt has failed to list the elements

of a cause of action for assault and provides no facts with citations to the record that would

support each element.  According to defendants, the facts submitted in support of her hostile

environment and retaliation claims do not, taken as a whole, separately, or selectively, make out

a claim for assault under Alabama law.  Defendants maintain that there is no record evidence that

Smith ever engaged in conduct that would create, in Gerhardt's mind, a well-founded fear of an

eminent battery.  Defendants also assert that there is no evidence that Smith had the apparent

present ability to effectuate an attempted battery.  *Wood v. Cowart Enterprises, Inc.*,

809 So.2d 835, 837 (Ala. Civ. App. 2001).

## III.   Plaintiff Gerhardt's Reply.

### A.   Plaintiff Gerhardt Was an "Employee" of Defendant Alabama Home Construction, Inc. Within the Meaning of Title VII.

Gerhardt disputes defendants argument that, based on the "Contractor and Subcontractor

Agreement" between her and AHC, she was an independent contractor.  Gerhardt maintains that

AHC had control over her as an employee.

The Eleventh Circuit has held that the economic realities of the employment relationship

determine whether someone is an "employee" within the meaning of Title VII, that status being

determined in light of the common law principles of agency and the right of the employer to

control the work of an employee.  *Cuddeback v. Florida Bd. of Educ.*, 381 F.3d 1230, 1234 (11th

Cir. 2004);  *Cobb v. Sun Papers, Inc.*, 673 F.2d 337, 340-41 (11th Cir. 1982).

The United States Supreme Court has also given guidance in differentiating between an

"employee" and an independent contractor under federal law.  The Court identified the following

factors as relevant to determining employment status: (1) the hiring party's right to control the

25

manner and means by which the work is performed; (2) the skill required; (3) the source of the

instrumentalities and tools used in the work; (4) the location of the work; (5) the duration of the

relationship between the parties; (6) whether the hiring party has the right to assign additional

projects to the hired party; (7) the extent of the hired party's discretion over when and how long

to work; (8) the method of payment; (9) the hired party's role in hiring and paying assistants;

(10) whether the work is part of the regular business of the hiring party; (11) whether the hiring

party is in business; (12) the provision of employee benefits; and (13) the tax treatment of the

hired party. *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-24 (1992) (quoting

*Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-52 (1989)). *See also*

*Clackamas Gastroenterology Assocs., P. C. v. Wells,* 538 U.S. 440, 445 n.5 (2003) (citing factors

from *Darden*). All of these factors must be weighed together, and no one factor is decisive.

*Darden*, 503 U.S. at 324 (quoting *NLRB v. United Ins. Co. of America*, 390 U.S. 254, 258

(1968)). According to Gerhardt, when these factors are applied to her relationship with AHC,

the purported subcontractor agreement resembles more of a payment scheme than an overall

employment contract.

    Gerhardt points towards Phillip Gilbert's deposition testimony that he had authority to

discipline her, and that he was sure he had exercised that authority. Gilbert also testified that he

had the authority to discipline Thomas, Smith and Logan. The "subcontractors," such as

Gerhardt and Logan, were interviewed by Gilbert, and the areas in which they could sell were

limited by Gilbert or William Daugherty. The corporate defendants also controlled the separate

sales offices' hours of operation. A document entitled "Branch Business Hours," which was

distributed to the sales offices by the corporate defendants, states that the office hours were to be

Monday through Friday 9:00 a.m. to 5:00 p.m. and Saturday 9:00 a.m. to 3:00 p.m.  Further, the staff in these offices were required to have one day off per week other than Sunday, because, according to Gilbert, "that's just the way the company felt, you should have at least two days off a week."

Gerhardt also draws the court's attention to Gilbert's testimony that sales people were required to keep up with their attendance and that the company had a dress code policy that required business-like dress.  This dress code was reduced to writing and was distributed to staff members on or about May 15, 2000, before Gerhardt's termination.  Among other requirements, the dress code prohibited tank tops, denim, and sandals.  Furthermore, the corporate defendants imposed a strict phone protocol on the sales offices.  A memo directed to "all employees" directed the sales office staff on the proper method of using the phone and stated in a hand-written addition that, "Anyone that calls Phil or Suzanne [Gilbert] at home is automatically terminated."

Additionally, Gerhardt highlights several other portions of Philip Gilbert's deposition testimony to support her argument that she was an employee of AHC.  Gilbert testified that AHC furnished the sales people with applications, brochures, copy machines, printers, and price sheets.  Additionally, Gilbert stated, AHC provided the sales people with a basic outline of how to sell homes at "our" price and to "our" standards.  Gilbert also asserted that he and William Daugherty conducted monthly sales meetings with AHC's entire sales force at the corporate office Albertville to discuss how to increase sales.  According to Gilbert, AHC required its sales people to "bird dog," i.e. put brochures in stores and business, one day a week.  Gerhardt highlights a memo from Gilbert dated September 5, 2000 and distributed to "All Offices," which

states in part:

> All Sales people have 1 day per week to bird dog and put up job signs. This day is NOT an extra day off . . . I expect each of you to get off your dead cans and start bird-dogging.

Gerhardt responded to this memorandum by fax the same day. According to Gerhardt, she responded just as an employee would report to her supervisor, explaining her actions during the period in question. Another undated memo instructs all offices on AHC's loan approval policy and the mechanics of closing sales.

On May 17, 1999, Philip Gilbert wrote to Gerhardt and Logan, stating that William and Janie Daugherty would be working with them in sales, but that they would have to answer to him "for anything with administration." The letter further stated that Gerhardt and Logan would have to send weekly sales reports both to the Daughertys and to Gilbert. Finally the letter asserted that if Gerhardt or Logan were "going to be late for work, out sick, need a day off, need to change off days, etc." they must call Gilbert.

Gerhardt points to AHC's adoption of a sexual harassment policy after her termination to further support her contention that she was an employee of AHC and not an independent contractor. Gerhardt asserts that there would be no need for a sexual harassment policy if, as AHC maintains, sales people are independent contractors not subject to the protection of Title VII. AHC's sexual harassment policy, which was adopted in approximately December 2000, specifically refers to the ability of sexual harassment to "[undermine] the employment relationship," and states that "[n]o sales consultant or employee . . . should be subjected verbally or physically to unsolicited and unwelcome sexual overtures or conduct." Gerhardt notes that the policy addresses AHC's ability to take disciplinary action for violations and also states as

follows:

> [AHC] wants you to have a work environment free of sexual harassment by management personnel, by your coworkers and by others with whom you must interact in the course of your work for [AHC]. Sexual harassment is specifically prohibited as unlawful and as a violation of [AHC's] policy. [AHC] is responsible for preventing sexual harassment in the workplace, for taking immediate corrective action to stop sexual harassment in the workplace and for promptly investigating any allegation of work-related sexual harassment.

According to Gerhardt, this written policy belies AHC's assertion that it is not liable under Title VII for the sexually harassing conduct of its employees.

Gerhardt further argues that the length of time she worked for AHC, from February 1998 to September 2000, a period of two-and-a-half years, supports her contention that she was an employee. Finally, Gerhardt asserts that the economic reality of the above discussed facts demonstrates that the corporate defendants' sales people were employees and not independent contractors.

**B.      Defendant AHC Is an "Employer" Within the Meaning of Title VII.**

**1.      AHC Employed More Than Fifteen Persons During Gerhardt's Employment.**

Gerhardt argues that AHC can be held liable under Title VII because it had more than fifteen employees in 2000, when the events in question occurred. Gerhardt points out that there were at least 15 sales people, as evidenced by the Contractor and Subcontractor Agreements introduced during Philip Gilbert's deposition. When Gilbert himself is added to this number of employees, the statutory requirement is met even without counting AHC's non-salesperson employees. Further, Gerhardt notes, the EEOC, in its investigatory role, determined that AHC was an employer within the meaning of Title VII.

29

2.      **The Separate Corporate Entities of AHC, AHCI Management, and Alabama Mortgage Can Be Considered a "Single Employer" for the Purpose of Title VII.**[22]

According to Gerhardt, a liberal construction must be given to the term "employer" under Title VII. *McKenzie v. Davenport-Harris Funeral Home,* 834 F.2d 930, 933 (11th Cir. 1987). The Eleventh Circuit has utilized the National Labor Relations Board's standards in determining whether two or more businesses should be treated as a single employer under Title VII. *Id.* These factors include: (1) interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control. *Id. See also Lyes v. City of Riviera Beach, Fla.,* 166 F.3d 1332, 1341 (11th Cir. 1999) (discussing the National Labor Relation Board's standards). A finding of single employer status requires a showing that the separate entities are "highly integrated with respect to ownership and operations." *McKenzie,* 834 F.2d at 933. Gerhardt asserts that, as with the "employee" factors of *Darden,* not every factor need be present and no single factor is controlling. *Lyes,* 166 F.3d at 1341 n.5.

Gerhardt points out that Suzanne Gilbert is the President and only officer of AHCI Management and that Philip Gilbert is the President and only officer of AHC. Philip Gilbert is also the President of Alabama Mortgage. Both Suzanne and Philip Gilbert own AHC. Further the offices of AHCI Management are located within the corporate headquarters of AHC.

Gerhardt argues that the Gilberts collectively control the operations of the three different companies from the same location, and that all three do business within the industry of

---

[22] Gerhardt asserts that the court's acceptance of her argument regarding joint employment would render moot defendants' argument that her EEOC charge was untimely filed.

manufacturing and selling mobile homes. According to Gerhardt, the three companies are more like divisions of a common enterprise rather than wholly separate entities. Given these facts, Gerhardt asserts, the three companies should be considered a "single employer" withing the meaning of Title VII, allowing her to bring valid Title VII claims against AHC.

### C. Hostile Work Environment.

Gerhardt disputes defendants' arguments that Smith's comments were not unwelcome. Gerhardt points to the evidence that she often asked Smith to stop his sexually-related conduct at work and that she repeatedly reported Smith's actions to her supervisors. Gerhardt argues that, if Smith's comments were welcome, she would not have reported them to her supervisors, filed a charge of discrimination, or instigated this lawsuit.

### D. Retaliation.

Gerhardt also contests defendants' position that she did not participate in protected activity as required to support a claim for Title VII Retaliation. According to Gerhardt, she participated in a "litany of protected activity," including reporting Smith's conduct to her supervisors, demanding that Smith desist from his conduct, and requesting that she be transferred to another office because of Smith's conduct.

## IV. Plaintiff Thomas' Opposition to Defendants' Motion for Summary Judgment.

### A. Plaintiff Thomas Has Established a Prima Facie Case of Hostile Environment Sexual Harassment Against Defendants.

Title VII of the Civil Rights Act of 1964 states that "It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1).

To establish a hostile environment sexual harassment claim under Title VII, a plaintiff must

prove: (1) that she belongs to a protected group; (2) that she has been subjected to unwelcome

sexual harassment;[23] (3) that the harassment was based on her sex;[24] (4) that the harassment was

sufficiently severe or pervasive to alter the terms and conditions of employment and create a

discriminatorily abusive working environment;[25] and (5) that a basis for holding the employer

liable exists.[26] *Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1244 (11th Cir. 2004) (citing

*Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir.1999) (en banc)).

### 1.     Plaintiff Thomas Belongs to a Protected Group.

---

[23] The EEOC regulations define the type of conduct that may constitute sexual harassment: "sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." *Henson v. City of Dundee*, 682 F.2d 897, 903 (11th Cir. 1982) (citing 29 CFR § 1604.11). In order to constitute harassment, the conduct must be unwelcome in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive. *Henson*, 682 F.2d at 903.

[24] The plaintiff must demonstrate that but for the fact of her sex, she would not have been the object of harassment. *Henson*, 682 F.2d at 904.

[25] The state of a plaintiff's psychological well being is a term, condition, or privilege of employment within the meaning of Title VII. *Henson*, 682 F.2d at 904 (citing *Rogers v. EEOC,* 454 F.2d 234, 238 (5th Cir. 1972)). The totality of the circumstances are examined when determining whether sexual harassment at the workplace is sufficiently severe and persistent to affect seriously the psychological well being of employees. *Henson*, 682 F.2d at 904 (citing 29 C.F.R. § 1604.11(b)).

[26] A plaintiff must demonstrate that the employer knew or should have known of the harassment in question and failed to take prompt remedial action. *Henson*, 682 F.2d at 905 (citations omitted). A plaintiff can demonstrate that the employer knew of the harassment by showing that she complained to higher management of the harassment, or by showing the pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge. *Id.* (citations omitted).

Thomas argues that, as a female, she has satisfied the first element of her prima facie claim of hostile environment sexual harassment.

### 2.    Plaintiff Thomas Was Subjected to Unwelcome Sexual Harassment.

Thomas asserts that she has experienced unwelcome sexual harassment in that she was subjected to verbal and physical conduct of a sexual nature that she did not solicit or incite, and that she deemed undesirable and offensive. *See Henderson,* 682 F.2d at 903.

Thomas maintains that, during her employment with the corporate defendants, she was subjected to sexual harassment by Smith. Thomas argues that during her deposition she testified that, between June 2000 and September 9, 2000, Smith engaged in numerous acts of sexual harassment towards her. Smith made passes at her and commented that she was very attractive. Thomas testified that, every time she saw Smith in the office, he would state that he should have "saved her" for himself instead of introducing her to her husband. Additionally, Smith asked Thomas to have an extramarital affair with him and discussed his sex life in her presence on numerous occasions. Smith also asked Thomas questions regarding her sexual interactions with her husband. Further, Smith told Thomas that his wife rarely had sex with him and would not allow him to subscribe to the Playboy channel. Finally, Thomas points out, on August 18, 2000, Smith, without her knowledge or permission, lifted up her skirt, exposed her underwear, and looked underneath while she was having a business-related conversation on the telephone.

### 3.    Smith's Harassment Was Based on Sex.

Thomas argues that it is obvious that, but for her sex, she would not have been the object of Smith's harassment.

### 4.    Plaintiff Thomas Was Subjected to Sexual Harassment That Was

### Severe and Pervasive.

Title VII prohibits the type of severe or pervasive sexual harassment that "alter[s] the conditions of the victim's employment." *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 78, 81 (1998). To be actionable under Title VII, a hostile work environment must be both "objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998) (citing *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21-22 (1993)). Harassment is subjectively severe and pervasive if the complaining employee perceives it as such. *Harris,* 510 U.S. at 21-22. Objective severity is evaluated "from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1246 (11th Cir. 1999) (quoting *Oncale,* 523 U.S. at 81). In order to determine whether an environment is sufficiently hostile or abusive, the courts look to: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with an employee's work performance. *Faragher,* 524 U.S. at 787-88; *Johnson v. Booker T. Washington Broadcasting Serv., Inc.,* 234 F.3d 501, 509 (11th Cir. 2000).

Thomas argues she has presented sufficient evidence from which a reasonable jury could find that Smith's sexual harassment was objectively severe and pervasive. Based on her testimony, Thomas argues, a jury could easily find that Smith's conduct was pervasive, unwelcome, and unreasonably interfered with her work performance, subjecting her to a sexually abusive work environment. *See Splunge v. Shoney's, Inc.,* 874 F. Supp. 1258, 1273 (M.D. Ala.

34

1994) (holding employee raised a genuine issue of material fact as to whether the alleged

harassment was "sufficiently pervasive so as to alter the conditions of employment and create an

abusive working environment" when her supervisors engaged in conduct including: frequent

"sexual comments" and jokes; comments about plaintiff's "big behind;" "plenty" of remarks

about plaintiff's breasts, including how "big and soft" they were and that she needed a larger

shirt; one incident wherein supervisor cornered plaintiff in the freezer and told her she could not

leave until she kissed him, to which she replied that they would freeze in this "mother

f_____;" references about supervisor's affair with plaintiff's co- employee; a comment that

only "fine sexy things" could work at the front counter; one incident wherein supervisor rubbed

against plaintiff and told her he knew she liked it; comments on how good plaintiff looked and

smelled; and a two-hundred dollar solicitation by supervisor to come to his motel room).[27]

According to Thomas, the combination of both sexual and overtly demeaning comments

addressed to her by Smith is sufficient to defeat defendants' Motion for Summary Judgment as to

whether Smith's conduct adversely affected her ability to perform her job.

Thomas argues that, in addition to demonstrating that Smith's conduct was sufficiently

severe or pervasive to create an environment that a reasonable person would find hostile or

abusive, she has also demonstrated that she actually perceived the environment to be abusive.

Thomas points toward her deposition testimony that she did not like being alone in the office

---

[27] In *Splunge*, the court stated: "The combination of sexual innuendo and comments
overtly demeaning to Splunge are more than sufficient to defeat summary judgment as to
whether the environment adversely affected her ability to perform her job." 874 F.Supp. at 1273.
The court stated further: "while Splunge never complained to higher management about the
harassment, she has interposed a genuine issue of material fact as to whether the openness and
pervasiveness of the harassment infers knowledge on the part of defendant Shoney's, Inc." *Id.*

with Smith because of his conduct, and that she informed Gerhardt on several occasions that she did not like working alone with Smith.  Thomas also testified that she did not want Gerhardt to communicate her complaints about Smith's conduct to management because she was afraid that she would lose her job.  Thomas also highlights her testimony that, when she was initially hired, she was informed that there was to be no fraternizing between her and Smith and that, if such interactions were discovered, she would be terminated.  Thomas testified that she did not want to be a troublemaker and that she thought she could handle Smith on her own because she had previously worked in similar environments.  Thomas also draws the court's attention to the evidence that Smith directed sexual comments and actions towards other female staff members including Logan and Gerhardt.

> ### 5.      Defendants are Liable for the Hostile Environment Sexual Harassment Created by Smith.

Employers are liable under principles of respondeat superior for the actions of their employees when the employer "knew or should have known of the harassment in question and failed to take prompt remedial action." *Henson v. City of Dundee*, 682 F.2d 897, 905 (11th Cir. 1982).  A plaintiff can demonstrate that the employer knew of the harassment "by showing that she complained to higher management of the harassment . . . or by showing the pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge." *Id.*

Thomas again draws attention to her testimony that she complained on several occasions to Gerhardt that she did not like working alone with Smith, and that she was afraid she would be fired if she took her complaints to higher management.  Thomas also points to Gerhardt's deposition testimony in which she stated that she tried to report Smith's lifting of Thomas' skirt

36

to William and Janie Daugherty on the day it happened, August 18, 2000.

Thomas argues that the evidence here demonstrates that the corporate defendants were aware of Smith sexually harassing other employees prior to the August 18, 2000 incident. In support of this argument, Thomas highlights Gerhardt's testimony that she, on several occasions, reported Smith's conduct to William and Janie Daugherty,[28] who told her to handle the matter herself. Thomas also points towards Gerhardt's testimony that Logan complained to her and to the home office that Smith was spending too much time at her office in Sylacauga. Gerhardt also testified that she reported Smith's frequent trips to Sylacauga and her suspicions that "something was going on" to Janie Daugherty, who reported the information to her husband. Despite management's knowledge of Smith's conduct, Thomas asserts, nothing was done to stop it.

### a. Smith Was an Employee of Defendants Rather Than an Independent Contractor.

The Eleventh Circuit has stated that "it is the economic realities of the relationship viewed in light of the common law principles of agency and the right of the employer to control the employee that are determinative" of whether an individual is an employee rather than an independent contractor. *Cobb v. Sun Papers, Inc.*, 673 F.2d 337, 341 (11th Cir. 1982). In *Pardazi v. Cullman Medical Center*, the Eleventh Circuit listed several factors to be considered in making this determination. These factors are: (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist

---

[28] Janie Daugherty testified that she informed her husband of the complaints that Gerhardt made to her about Smith's conduct. Janie Daugherty further testified that she believed her husband told her that he would talk to Philip Gilbert about the complaints.

without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated, i.e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer;" (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays Social Security taxes; and (11) the intention of the parties. *Pardazi v. Cullman Med. Ctr.,* 838 F.2d 1155, 1156 (11th Cir. 1988) (citing *Spirides v. Reinhardt*, 613 F.2d 826, 832 (D.C. Cir. 1979)).

According to Thomas, the evidence in this case demonstrates that Smith was told when to work, what days he had off, and what he could wear to work. Additionally, Thomas contends, Smith was told how to perform his job as he was required to bird-dog. Thomas also asserts that defendants told Smith in which geographic locations he could sell or not sell. The evidence further demonstrates, Thomas asserts, that defendants paid Gerhardt additional money to supervise Smith's work for defendants. Finally, Thomas argues, defendants furnished all equipment at the Pell City office where Smith worked.

> **b.      Defendants Had Actual or Constructive Knowledge of the Harassment, and Failed to Take Prompt Remedial Action Against Smith.**

Once an employer learns of sexual harassment, it must take prompt remedial action which is reasonably likely to prevent the misconduct from recurring. *Durham v. Philippou,* 968 F. Supp. 648, 657 (M.D. Ala. 1997) (citing *Kilgore v. Thompson & Brock Management,*

38

*Inc.,* 93 F.3d 752, 754 (11th Cir. 1996)).[29]  Thomas argues that the evidence here demonstrates that Gerhardt had previously made complaints against Smith for sexual harassment but that defendants did not reprimand or terminate Smith.  Thomas points to Gerhardt's testimony that Smith's conduct continued after she made these complaints.

Thomas argues that Gerhardt's complaints placed defendants on notice that Smith could harass other employees in the future.  *See Durham v. Philippou*, 968 F. Supp. 648, 657 n.5 (M.D. Ala. 1997) (stating that other employee's report of harassment may place defendants on constructive notice that other employees could be harassed in the future).  Thomas asserts that, once a complaint regarding Smith's conduct towards her was made, she was interviewed by Philip Gilbert and terminated approximately eighteen days later.  Thomas points out that the corporate defendants, however, kept Smith in their employ.

According to Thomas, by allowing Smith to continue in his employment, the corporate defendants failed to exercise reasonable care in promptly correcting the sexually harassing behavior and in preventing it from occurring in the future.  Thomas asserts that there exists a

---

[29] To avoid liability, defendants may raise the *Faragher/Ellerth* affirmative defense that: (1) it exercised reasonable care to prevent and correct promptly any sexual harassment; and (2) plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by employer or to avoid harm by other means.  *Madray v. Publix Supermarkets, Inc.,* 208 F.3d 1290, 1296-97 (11th Cir. 2000).

However, Thomas argues that in this case the corporate defendants cannot raise the *Faragher/Ellerth* affirmative defense because they did not provide any preventive or corrective opportunities to Thomas to avoid Smith's conduct.  Thomas notes that AHC did not have an employee handbook or a sexual harassment policy during the relevant time period.  The company created its first sexual harassment policy in December 2000, months after Thomas was terminated and a few weeks after she filed her EEOC Charge of Discrimination.  Thomas also points out that AHCI Management created an employee handbook only after her termination.

material issue of fact over this element of her hostile environment sexual harassment claim and, therefore, summary judgment should be denied.

### B.    A Genuine Material Issue of Fact Exists as to Thomas' Claim of Retaliation.

To establish a prima facie case of retaliation, a plaintiff must show: (1) that she engaged in statutorily protected expression; (2) that she suffered an adverse employment action; and (3) that there is some causal relationship between the two events. *Holifield v. Reno,* 115 F.3d 1555, 1566 (11th Cir. 1997) (citing *Meeks v. Computer Associates Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994)).  In order to recover for retaliation, a plaintiff "'need not prove the underlying claim of discrimination which led to [her] protest;' however, the plaintiff must have had a reasonable good faith belief that the discrimination existed." *Holifield*, 115 F.3d at 1566 (citing *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989)).  Once the plaintiff has established her prima facie case of retaliation, the defendants then have the opportunity to establish a non-retaliatory reason for its action, after which the plaintiff can refute the proffered reason by proving pretext. *E.E.O.C. v. Reichhold Chemicals, Inc.,* 988 F.2d 1564, 1571-72 (11th Cir. 1993).

Here Thomas supports her claim of retaliation with the evidence that she was fired shortly after she reported Smith's lifting of her skirt and her interview regarding the matter with Philip Gilbert.  Thomas asserts that defendants claim that she was fired because there were two sales people in the Pell City office and, therefore, no need for a secretary.  However, Thomas argues that defendants reasons for her termination are a pretext.  Thomas notes that Gerhardt was terminated around the same time as she, leaving only one employee, Smith, in the Pell City office.  Additionally, Thomas argues, the entire time she worked in the Pell City office as a

40

secretary there were two sales people also in the office, Smith and Gerhardt.  Thomas also draws

attention to her testimony that she was informed prior to starting her employment with

defendants that, if she and Smith were caught fraternizing, she would be terminated.  Further,

Thomas did report Smith's conduct and her discomfort at being in the office alone with him to

Gerhardt, but was afraid that she would lose her job if her reports were voiced to higher

management.

In support of her argument that there is a genuine material issue of fact regarding her

retaliation claim, Thomas points to the evidence that she and Gerhardt were terminated

approximately eighteen days after Smith's conduct from August 18, 2000 was reported to

defendants' management.  Additionally, Thomas draws attention to the fact that Gilbert

interviewed her and Gerhardt regarding Smith's behavior before he terminated them.  Given this

evidence, Thomas argues, summary judgment should be denied on this claim.

**V.       Defendants' Reply to Plaintiff Thomas' Opposition.**

**A.       Sexual Harassment.**

**1.       Thomas Admits That She Was Never Sexually Harassed.**

Defendants draw attention to Thomas' deposition testimony that, following the August

18, 2000 incident in which Smith pulled up her skirt, she "had a few words with him, and he said

that it wouldn't happen again, and [she] was pretty confident that it wouldn't because [she was

able to take care of herself]."  Defendants also highlight the following deposition testimony of

Thomas:

> Q:     Prior to the dress incident, had anything like that ever happened?
> A:     Lavelle had made passes at me and comments about I was really
>        attractive.  He should have saved me for himself.  He should have never
>        introduced me to Torrence.  He should have saved me for himself.

> Comments like that, which I found odd because all of the years that I have known Lavelle, Lavelle had never ever came at me like that. Never. I never even imagined he found me attractive because he never made any type of advances or anything to me like that until after I started working there. I even asked him why was he coming at me like that. And he didn't really — he didn't give me an answer to that or nothing.
>
> Q:   Well, did those comments offend you?
>
> A:   I did not really pay him much attention. You have to understand my personae [(sic)] is that is how men are and that is what they do.
>
> Q:   Well, but do those comments offend you? Did you tell him to stop?
>
> A:   I said something like I ain't stuntin (sic) you.
>
> Q:   You ain't what?
>
> A:   Stuntin you.
>
> Q:   What is that? Spell that.
>
> A:   I can't spell that. It is Ebonics. It means I am not paying you any attention basically. That is slang for that. I'm not paying you no attention. I just kind of brushed it off basically is what I did.

Defendants also note that Thomas testified that, other than the dress incident, Smith never touched her.

On August 21, 2000, Gilbert interviewed Thomas regarding the August 18, 2000 incident. The interview was recorded. Defendants draw the court's attention to the following exchange from that interview:

> Gilbert:   Okay. What I'm after are just the facts. Has Lavell[e] ever sexually harassed you?
>
> Thomas:   No.
>
> Gilbert:   Okay. Have you had a good working relationship with Lavell[e]?
>
> Thomas:   Yeah.
>
> Gilbert:   Okay. Have you had a good working relationship with Beth?
>
> Thomas:   Yes.
>
> Gilbert:   Okay. As I stated a moment ago, I'm not your employer. Your employer is [AHCI] Management Company.
>
> Thomas:   Okay.
>
> Gilbert:   But I have to know these things. If there is any sexual harassment going on, I need to know about it so I can put a stop to it by going to the president of [AHCI].
>
> Thomas:   Okay.
>
> Gilbert:   But, and as I stated a moment ago, before we started recording this . . . this conversation has neither . . . has nothing to do with

|  | whether you stay or go. |
|---|---|
| Thomas: | Okay. |
| . . . | |
| Thomas: | Right.  I told Beth he hadn't touched me before, but you know, as a woman you know when a man looks at you and what he could be thinking. |
| Gilbert: | Right. |
| Thomas: | You know you get vibes . . . |
| Gilbert: | Right. |
| Thomas: | . . . from people.  And I mean, I've gotten the vibe from him but then I get that vibe from most men. |
| Gilbert: | Yeah. |
| Thomas: | So it wasn't a thing where I was scared to be around Lavell[e] or, I'm a little . . . I'm always been a little uncomfortable, he's got this funny glare where you know he stares at you. |
| Gilbert: | Oh yeah.  He does that at me. |
| Thomas: | You know, so that kind of makes you uneasy, and then like I said, I just haven't been in a working relationship with him, and I was just starting here, so I was just really just trying to do everything right, everything I was asked and, you know, definitely not cause any waves. |
| Gilbert: | Right. |
| Thomas: | And that was like my goal. |
| Gilbert: | And nothing's happened before, nothing since? |
| Thomas: | No. |
| Gilbert: | Okay, well then that's what I needed to know and . . . uh . . . you know, like I said, this is not, this has no effect on you, I just wanted to know the facts. |
| Thomas: | When he apologized, I just stated that if his intentions were different, that they were unwanted, and you know, if . . . 'cause my reply to him, when he was really sorry, "can you forgive me," I said "yeah, just, lets just let it go."  "Okay, pretend this never even happened and, you know, move on" and he was just like, you know, unsure and I was like "yeah I just want to forget, I don't even want to talk about it." |
| Gilbert: | Right. |
| Thomas: | Okay, let's just forget it and that was, you know, the end of that. |

## 2.    Thomas Admits That Sex Comments Were Mutual, Light-Hearted Banter.

Defendants note that when asked if both Smith and Gerhardt discussed sex at work,

43

Thomas testified as follows:

> A:    It might have went on for a few months.  But like I said, it wasn't like
> anybody came in the office and just said let's sit down and talk about sex.
> It was – I don't know what – it would be like something that would bring
> something up.  It was light hearted to me.  I don't know.  I can't really
> recall because I did not know I was going to have to be remembering all
> that stuff at that time.
>
> Q:    But they were both making light-hearted comments about sex
> periodically?
>
> A:    Right.
>
> Q:    Did you ever make light-hearted comments about sex?
>
> A:    I probably did.

### 3.    No Evidence That Alleged Harassment Was Because of Sex.

Defendant argues that Thomas has submitted no evidence that any alleged harassment

was because of her sex.

### 4.    Smith's Alleged Conduct Did Not Unreasonably Interfere With Thomas' Job.

Defendants contend that Smith's alleged misconduct did not interfere with the

performance of Thomas' job.  In fact, defendants note, Thomas testified as follows:

> Q:    And you are not alleging that Lavelle's conduct interfered with the
> performance of your job, are you?  I mean, you are not say because of
> what Lavelle did or said you didn't do a good job at work?  You are not
> claiming that, are you?
>
> A:    I don't think so.

### 5.    No Evidence of Damages.

Defendants assert Thomas has submitted no evidence of damages.

## B.    Retaliation

### 1.    No Complaints of Sexual Harassment During Employment.

Defendants assert that Thomas never complained of sexual harassment while employed

by AHCI Management, as evidence by her interview with Gilbert.

### 2.   A Legitimate, Non-Retaliatory Reason for Dismissal.

Defendants argue that AHCI Management Company has articulated a legitimate, non-retaliatory reason for Thomas' dismissal.

### 3.   No Pretext Evidence.

Defendants maintain that Thomas has not offered any evidence that its legitimate reason for her dismissal was a pretext for discrimination.

## VI.   Plaintiff Thomas' Reply.

### A.   Sexual Harassment.

Thomas disputes defendants' position that she admitted she was never sexually harassed. Thomas also maintains that, contrary to defendants' arguments, she has submitted evidence that the harassment was because of her sex. Thomas further maintains that Smith's misconduct did interfere with the performance of her job.

### B.   Retaliation.

Thomas disputes defendants' contention that she never complained of sexual harassment while employed by the corporate defendants. Thomas directs the court's attention to her deposition testimony that she told Gerhard "several times" that she didn't like working in the office alone with Smith, but that she did not report his conduct to higher management because she was afraid such a report would cause her to loose her job. Thomas also highlights the fact that she did report to the corporate defendants's management the August 18, 2000 incident in which Smith lifted her skirt. Finally, Thomas reiterates her argument that the corporate defendants' articulated reason for firing her is a pretext.

## CONCLUSIONS OF THE COURT

The court has considered all the factual allegations and legal arguments addressed above. The court concludes that there may be genuine issues of fact and law with respect to the retaliation claims of both plaintiffs. All other claims will be dismissed.

The subjective nature of the "law" in these cases is demonstrated by *Mendoza v. Borden, Inc.,* 195 F.3d 1238 (11th Cir. 1999). Seven well-intentioned judges felt that there was not sufficient evidence of sexual harassment. Four well-intentioned judges thought that there was. This court has found no magic answer. As they say, it apparently has to be determined on a "case by case" basis, whatever that means. However, after fully considering the recited evidence in *Mendoza* and the cases cited in *Mendoza* at pages 1246-47, this court cannot conclude that a reasonable jury could find the conduct as alleged here to be severe and pervasive enough to alter the terms and conditions of the plaintiffs' employment. The conduct was not severe nor physically threatening. Neither did it interfere with the employees' job performance. It certainly was not commendable and may have been reprehensible, but it was no worse than that described in *Mendoza* and the cases cited by the majority in *Mendoza*.

On the other hand, the evidence is sufficient to establish that the plaintiffs made a good faith complaint about harassment and were, shortly thereafter, discharged. The issue of cause is one for the jury. The evidence in this regard may not be overwhelming and will have to be further considered at trial, but summary judgment would be inappropriate.

46

This 28th of October, 2004.

ROBERT B. PROPST
**SENIOR UNITED STATES DISTRICT JUDGE**